The next matter, number 23-1870, Susan Kiernan O'Horo, M.D. v. Boston Medical Center Corporation, et al. At this time, would counsel for the appellant please introduce himself on the record to begin? Good morning, Your Honors. My name is Edward Foy. I represent the plaintiff below and appellant here, Susie O'Horo, Dr. Susan O'Horo. Okay, are you going to reserve any time for rebuttal? Yes, Your Honor. I'd like to reserve two minutes, please. Okay. And before you begin, this is just a comment for both parties. After this case was decided, the Supreme Court of the United States decided the Muldrow opinion. So if you think that favors or doesn't have anything to do with how the case should have been resolved, it'd be nice if at some point in your argument you discussed if that changes the landscape or the result. So go ahead. I think that is the headline news here, Your Honor, is the Muldrow case. But if I may, I'm going to start with what I think the center of gravity of the case is based on the facts, and that's the whistleblower claim. In 2019, Dr. O'Horo was an interventional radiologist at the Boston Medical Center, which is an academic teaching hospital and trauma center in the south end of Boston. She was the director of quality and safety, and as part of her job, she tracked the nature and extent of complications within the interventional radiology department. One doctor in particular, Dr. James Higgins, was the source of a very large number of those complications, both in terms of frequency and severity. She began speaking with her superiors almost immediately in January of 2019. She wrote an email to Dr. James Moses, who was the BMC's chief quality officer. In September of 2019, she wrote a letter to Dr. Rabin Davidoff, BMC's chief medical officer, and Scott Friedman, the chief risk officer. And then on December 7, 2019, completely at the end of her rope, she wrote a letter to the Massachusetts Department of Public Health. All of these letters are in the addendum and in the record appendix, and all of them contain specific direct complaints, details of facts of how Dr. Higgins had created a situation that led to him acquiring the nickname of the Boston Butcher. I'm having trouble following your constructive demotion or constructive discharge argument in terms of understanding how the contours of Dr. Ahura's employment were altered in such a way that a fact finder could deduce that she was actually constructively discharged or demoted. I think that in the connection with the whistleblower claim, this is of minimal significance, because the statute does not require, and never did, a substantial disciplinary action. The constructive discharge was a claim that was brought because of the pre-Muldrow standard for a disparate treatment claim of substantial harm. Now, that said, there was sufficient facts, and I think a useful heuristic here is to look at the list of job duties that the lower court put on page four of its decision, developing and overseeing the physician evaluation process, specifically including the focused professional practice evaluation programs. Well, that was not only taken from her, they put her under a focused practice. Can I focus on this, because I do think this is the heart of it? Here's one interpretation of the record. She's the quality person. She comes across a pretty significant quality problem that she's identified with Dr. Higgins. She goes and brings that to the hospital's attention multiple times with substantial vigor. And the hospital takes steps to say, you know what, that is a problem, and we need to investigate. And ultimately, that investigation is going to be subject of scrutiny on the other side. And so what we don't want is to have the person leading the investigation, who was the person who was most vocal in bringing that to our attention, because when and if that comes out that Dr. Higgins is bad, we are going to have to face the response that we put the person in charge who had prejudged the case. And so most of what you told me in the brief release I heard was, it's about how they cut her out of the Dr. Higgins problem, and it struck me that that would make sense to do in these circumstances. It was much more than cutting her out of the Dr. Higgins problem, though, Your Honor. They also placed her under a microscope for her own clinical work. She was the one who devised the focus process. And so that's the, that they looked at her. Professional evaluation. They looked at her more times. They turned it back on her. They not only cut her out from the Higgins investigation, but in December of 2019, shortly after she wrote her letter, there was a meeting in Dr. Soto's office with all of the IR physicians except her, to discuss how they were going to deal with the DPH situation. The quality and safety protocols that she instituted, again, were turned back on her. It was a question of consistently taking away her fundamental job duties. So her fundamental job duty is radiologist. Well, no, her fundamental job duty is director of quality and safety. And that's, I think, why when one looks at the job duties that the district court quite correctly listed, merely doing radiology is only a very small part of it. And I think that the purpose of the Whistleblower Act is to ensure that those who do blow the whistle on situations like this are not personally retaliated. So outside of Dr. Higgins, what you've told me is when they did their sort of overall look at quality, Dr. Vildavahan looked at her more times than other people. That's one thing. That's one thing, yes. And the other thing is there was a meeting in December where they discussed her complaint that she was not at. Yes. And when they finally brought an outside reviewer to evaluate the division, she was excluded entirely from that process, even though she was the director of quality and safety. But that was a, well, I guess that wasn't about Dr. Higgins per se. They made that about, did the Greeley group review everybody or just Dr. Higgins? They reviewed many people, but they reviewed Dr. Higgins as well. They, this was also. What was their charge, do you know? Their charge was to, they were given a number of case files for review, many of them from Higgins, some from other doctors as well. By the way, Dr. Brown's affidavit, which is contained in the addendum, details this, gives you some details about this process, and there were more than others. And Greeley found that the majority of Dr. Higgins' cases were either substandard or just plain wrong, that he poorly handled them. But Dr., the key point is that Dr. O'Hara, who should have at least been part of these efforts, was marginalized and pushed aside. And at the same time, she was complaining about him. So what's your response to what I, so that does seem to tie to what I posited two minutes ago, which is there's a business reason that that makes sense to do in these circumstances that are not retaliating against her. It's to protect the sort of, to protect our investigation of Higgins so that it's not subject to criticism later on this basis. What's your response to that? There might be a business reason if the jury believes that. But the fact that the hospital, these two things don't connect very well in my mind. The fact that the hospital was interested in patient care and did not want to see its patients continue to be harmed doesn't mean that they didn't also retaliate against her and didn't mean that they didn't also send a message to the other doctors in the hospital, don't you take this problem outside the walls. But they put forward a legitimate non-discriminatory or retaliatory reason, in my mind at least, which is we have a good business reason for her not to be in the middle of what we're going to do about Higgins. And your response to that is, no, that's pretext because... because you can look at the number of other circumstances surrounding it, including the fact that Dr. Higgins, for example, and not Dr. O'Hara, was named as the medical student clerkship director in September 2019, right after she wrote her letter of complaint. And soon thereafter he was named the director of early specialization in interventional radiology. And that's after she left, right? And that was after she left. But I think that that in itself, so we can agree, I think that that isn't direct retaliation. But the point, I think, Your Honor, is that these saying, trust us, we really... these things weren't intended to retaliate against her, they were simply the way we do things around here, runs into the problem that the way they did things around there was itself in a discriminatory manner. You need to look at, I think... I mean, they may have done things badly, but that's not the same as doing things retaliatorily. And I guess that's where I'm not necessarily linking it up. You may think she'd be the best one to run this, but there's an argument she's not. And so what's the argument, what's the evidence that they were motivated by something sinister as opposed to a disagreement with you about what the best thing to do is? I think, Your Honor, that on summary judgment, you need to look at the issue of intent as being one that is fundamentally for the jury, provided that there is some evidence of retaliation. And I think that when you see... There has to be genuine issues of material fact. That's a test. So where are those genuine issues? Well, when you take the facts that I've set forth for you here and also look at the facts that were set forth in the other facts set forth in the brief and you look at them collectively, the question becomes, is there enough here that a reasonable jury could infer that the same people who told the only female physician in the entire department that she's a square peg in a round hole and the same people who told her that her interactions with Dr. Higgins were the result of her emotional intelligence problems, that these very same individuals, when the time came, deprived her of the medical clerkship and gradually marginalized her... So you say deprived. It seems to me they hand out collateral duties. And you don't really get anything for it unless you already sort of... There's this one day of academic time you can get. She already had it. But it doesn't strike me that these things are, as you make it, like there was some big thing out there that she wanted and then they took it away from her. I mean, it just seems like they handed these out. She already had one. They didn't want to hand her another one because there was nothing for her to gain by it. Why is that not a way to think about this? Well, that might be something that could certainly be presented to the jury. But I think that when you take someone who, for 15 years, had been the director of early specialization in interventional radiology at the Brigham and Women's Hospital while she was affiliated with the Harvard Medical School, and you say, no, we're not going to give you the job of director of early specialization here at the Boston Medical Center. We're going to give it to this fellow over here who can't put a catheter in a patient, right? This can fairly be seen as something other than purity of motive, particularly where it's accompanied by the statements that you had about her individually, made by her superiors to her whenever she complained about the situation. This was the old boy network closing in on itself and protecting one of its own. And it was nothing more than that. I think it's also helpful here to look at some of the case law on this. In Toohey v. Brigham and Women's Hospital, the whistleblower was ordered to mandatory counseling in connection with a conditional renewal of her privileges. Just mandatory counseling alone was considered sufficient for a whistleblower claim. In Fornier v. Massachusetts, threatening an employee with a transfer or a demotion was a sufficient retaliatory claim. I guess I do have a legal question on that point. The Massachusetts statute lists a bunch of things that sound more like adverse actions that appear in the substantive provisions of Title VII and then have a term harassment in addition to those, sort of like demotion, loss of job. Title VII, on the other hand, in the retaliation provision, just says discrimination for engaging in a protected act. And out of that flows Burlington Northern, which says anything that would dissuade. So you've argued either the standards of Burlington Northern or less. But there's an argument that it's more because the statute seems to parallel some of the sort of substantive Title VII where you need an adverse action in terms of a change in the terms of condition. I think, Your Honor, that the statute works on its own bottom, that the statute is not looking toward Title VII or the Title VII standards at all, and that the public policy that the whistleblower statute serves has really nothing to do with discrimination law whatsoever. It isn't even solicitude toward Dr. O'Hara. It's solicitude toward the patients and the others who might benefit from the complaint. But under the statute, at its own bottom, it says, discharge, suspension, demotion, harassment, denial of promotion or layoff, or other adverse action. Other adverse action affecting the terms and conditions of employment. And if one goes to the case of Massachusetts, Yee v. Massachusetts State Police in 2019, Judge Gantz talks about the terms and conditions of employment and defines it very broadly to include the atmosphere. It is anything which marks any sort of retaliation. My time is up without addressing the headline news. Briefly, we just think that Muldrow effectively takes away the floor that the district court used in deciding a district treatment plan. I'll hit my question on that just to get right to it. So Muldrow, if there is no term and condition affected, Muldrow doesn't matter. Muldrow comes into play if you think a term and condition has been affected. It doesn't need to be substantial, material, important, whatever. Is that your understanding? That's your statement, Your Honor. And so if Judge Bowles, I think, said there was no term and condition affected, then Muldrow doesn't play in on that. It would be if you said there was a term and condition affected, but it's not a sufficiently important one. Yes, but, Your Honor, I think when you look at the breadth of the meaning of the phrase terms and conditions, the term terms refers to the contractual relationship and the job duties. And if you look at the four job duties that I outlined a moment ago from the judge's own decision, they took every single one of them away from her. If you look at the conditions of employment, the environment, the atmosphere that she worked in, that, too, was a negative. I think there are two cases, just very briefly. Mills Appie, General Motors, a Sixth Circuit case decided in May. The plaintiff suffered harm as a result of his reassignment because the position failed to utilize his skills and forced him to work by himself. And the Sixth Circuit said, well, once upon a time, that wouldn't have worked, but under Muldrow, that is sufficient. We reverse and we remand. In Colby Group Health Plan, an Eighth Circuit case that was decided just about a month ago, the identification badge of the employee was changed to publicly identify her vaccination status, and that led to, quote, frequent criticism from her vaccinated coworkers, and she began attending meetings on Zoom to avoid uncomfortable situations. She was reassigned to different patient care areas or work settings. All of those things, any of them, were deemed sufficient, at least on the 12B6 motion that was before the cold court, to require further investigation. Okay. Thank you. You have two minutes for rebuttal. Thank you, Your Honor. Let's hear, then, from Counsel Kurtz for the appellate. Please introduce yourself on the record if you can. Good morning, and may it please the Court. David Kurtz for the appellate. I think the, use a phrase from one of the earlier arguments, the blue whale in the room, so to speak, is the impact of the Muldrow case, and so I thought I'd get right to addressing that. In Muldrow, the Supreme Court granted cert to resolve a circuit split over whether an employee challenging a transfer under Title VII must meet a heightened threshold of harm or whether any showing of harm arising out of the transfer would be sufficient. So decisions from April, and in the days and weeks immediately following the issuance of the opinion, the major debate focused on whether or not the decision would apply outside of the context of a transfer. In our brief, Why wouldn't it? I mean, Justice Kagan's opinion is talking about the term, terms and conditions, and says don't put a modifier on it, don't add material, don't add substantial. Terms and conditions is the broad term, and she, in her opinion, is talking about that. Why would we limit that only to transfers? That doesn't make sense. Well, Your Honor, because that was the issue that cert was granted on, and specifically. Do you have some reason to distinguish transfers from other terms and conditions? Well, they were looking to determine when there's actually harm associated with a transfer. So you can be transferred and not experience any significant harm arising out of that. So they were looking at situations where somebody may get a new job. They're making the same amount of money. Maybe their title's at the same level. Maybe they have a nicer office. Right, and I think when we move to terms from move to Office A to Office B, and that may not be a transfer, but maybe it's a change in my term and condition, and we don't ask a further question about how significant. That seems to be what it's talking about. And, Your Honor, in the earliest days following the decision, the courts were focused on transfers. As time moved on, courts started focusing more on applying that standard to any terms and conditions of employment. In fact, we submitted a letter of supplemental authority yesterday, and one of those cases comes from the First Circuit. It's the Rios versus Senterra group decision. And that case did not apply Muldrow in a transfer case. It was a disability discrimination failure to accommodate case. But it's really helpful. And so the plaintiff in that case was a former security guard at Coast Guard facilities in Puerto Rico. He argued that he experienced a bunch of adverse employment actions when supervisors told him not to eat at his post, not to park his car near the guard rest house, not to use the guard rest house bedroom to change his clothes. And what the court noted there is that none of those incidents resulted in any formal discipline to him. And in citing Muldrow, what the panel held was that a mere admonition by a supervisor without any formal consequences is not an adverse employment action because it does not represent any disadvantageous change in the terms and conditions. Right. And that makes sense. Okay. So getting to this case, if that's the idea, right, what the question is, really not Muldrow, but do we get through the door were terms and conditions of her employment changed? And they say you took away from her the quality assurance role. And they say you did that by keeping her out of meetings, number one, so I want to know why was that, and that you were looking at her in a way that was not appropriate in terms of the number of procedures you were examining of her. And they say that was to take away her quality, not to admonish her, but to deprive her of the term and condition of being the quality specialist. Why are they wrong about that? The district court found exactly to the contrary on all of those things. So even if you're looking, so what was argued at the lower court was whether there was a constructive demotion, which is something that has not been recognized. Okay. What is the non-legitimate reason that she was looked at four times more than everybody else? Well, she was scheduled to be looked at four times. It was just part of what the scheduling was. And, in fact, she was only reviewed a grand total of once during the course of that review. And, in fact, So your answer is your non-legitimate reason is it was just a scheduling coincidence. It was part of the review process at that time. That was what the schedule was at that time. Even though the guy that's under scrutiny is looked at less, and she's looked at more, and your non-legitimate reason is that's just sort of an accident of the schedule. Well, the record shows that the guy who was under scrutiny had been under scrutiny for months and months. He had been, his procedures had been watched. He had been under review by the division chief, Dr. Phil Benden. All of his procedures were reviewed by the Greeley Company as part of their outside reviews. So this was all part of, you have to look at the whole in order to understand what was taking place here. What the district court looked at is, they certainly applied a materiality standard, but if you just go to this terms and conditions and any adverse impact on terms and conditions, the district court found that most of her duties remained intact throughout her employment, that other physicians shared responsibility. But if we're applying a Burlington Northern type standard to the 187 claim, it's would these actions taken by the hospital have likely dissuaded her from complaining? So if she had known I will be kept out of meetings that are relevant to my department, if I had known I would be now reviewed four times more than everybody else, I would not have come forward. So now that doesn't get to the ultimate question. That might get her through the door. So I'm asking why did you, I think it might. Why did you do those things? So, well, and I just want to make sure we're not blurring the lines, right? So the Muldrow opinion applies to Title VII. The Healthcare Whistleblower Act is judged by a different standard, which I think is, as you mentioned, Your Honor, maybe even a stretch. But as your colleague said, that's the stronger claim. That's the one he pressed. That's the one I want to talk about. So why are those actions not sufficient to meet a standard of retaliation? I will be investigated more than everybody else. I will be kept out of meetings. Why is that not enough to meet the, this would dissuade me part of the analysis? There's no evidence at all, Your Honor, that she was any worse off, that any specific terms and conditions of her employment were taken away. She shared responsibility with others for quality and safety within the IR division. She raised these complaints, and that's something you mentioned, Your Honor. She brought these complaints, and to have her be in charge of the investigation, to have her run that investigation, that causes a whole host of problems. So asking her, having her step aside from part of this investigation that was based on her actual complaints, it made business sense. It's something that has to be done. Okay, but follow through the analysis with me, right? Step one, the question is, did something happen to her? I'm going to use Burlington Northern, unless you tell me to use a different standard. So under Burlington Northern, the standard is, did something happen under her employment that a reasonable person would feel dissuaded from complaining? She says, yes, things happened to me, like I ended up under the microscope of investigation. And there is evidence that she's scheduled more times than other people. Then the question for you is, well, why did you do that? And you would say, I think it was a coincidence or an accident of scheduling. And they would say, temporal proximity. You did that immediately after I complained. Isn't that enough for a jury? That's how I follow this through. Why not? Well, temporal proximity, the test when it comes to temporal proximity is that you need to look at the entire summary judgment record. So temporal proximity in and of itself is not sufficient to create an inference. So what the evidence shows and what the record shows is that she complained multiple times about Dr. Higgins, one, two, three, four times. She complained to people internally. She complained via letters. So she did all of this. First of all, she continued to do it, showing that she wasn't dissuaded from doing anything. In fact, she continued to bring her complaints. And the court looked at all of this and said it didn't have any change. It didn't create any change to the terms and conditions of her employment. But I guess that's slippery, right? Because if we're under Burlington Northern, it's not terms and conditions. It's things that happen to me at work that a reasonable person would be dissuaded from complaining. That's the Burlington Northern standard. That's not terms and conditions. I'll accept her argument that she's spotlighted more as not a term and condition. But it makes her uncomfortable. It makes her think they're watching me. And if they did that for retaliatory reason, that might be actionable under Burlington Northern. You need a non-retaliatory reason for having done that. And I guess what you're telling me is it's just how the chips fell when we made the schedule. Well, right. So what's important to know is that the lower court here stopped the analysis of the prima facie case. So it said, hey, Dr. O'Hara did not assert adverse actions as a matter of law. Then Muldrow comes around and says, ah, maybe the standard of what you have to show for an adverse action is a little different. Material versus some negative impact on a term and condition of employment. In the record, we went through everything that Dr. O'Hara alleged happened to her, provided legitimate non-discriminatory reasons for all of it, and they didn't come back with anything sufficient other than, ah, it's the old boy network. Ah, they're CYA. No, they come back with temporal proximity and say, magically, the coincidental bad scheduling where I'm being looked at 400 times more than my colleague happens right after I complain. Isn't that, they would say, isn't that enough for a jury to figure out, was it really just an accident of how the chips fell, or are you after me? Not when you look at the entire record. So if you take temporal proximity standing by itself, something said, something happens. If that's all you're looking at, that's one thing. But the case law specifically says from this court, you look at more. You have to look at temporal proximity in the context of the entire. But you agree your legitimate reason is kind of weak? I mean, it just so happened that that's how it fell out, that she's reviewed 400 times more than everybody else. Shouldn't that go into how we think about whether there's a triable issue? I don't think so, Your Honor. I think that you have to look at what was happening in the context of what was going on as part of the entire record. So her complaints were being made. Are you saying that that doesn't create an issue of material fact? So there's not an issue of material fact. The courts, the lower court looked at what was alleged, looked at the explanations from the side, and decided based on that. Right, but that's why we're here, to figure out whether that was right. Well, that's exactly right. But no, I don't think there is an issue of material fact. Why was she kept out of this meeting in December of 2019? What's the reason? I don't recall exactly what the reason is, Your Honor, and I'm not sure if the record actually reflects that, but one meeting. And in fact, if you look at one of the cases that was recently cited in the papers, and it was in our supplemental submission yesterday, being kept out of one meeting. Well, let me nail you down to this. Do you accept that the standard under the retaliation claim for what is a sufficient action to get us into the sort of bigger analysis is Burlington Northerns, whether it might dissuade a reasonable person from complaining? Yes. Do you agree with that? I do. And if I believed that all my colleagues were having a meeting, and I'm told, you're not invited, or I'm not even told about the meeting, and the reason is because I complained, wouldn't that dissuade me from wanting to complain because you're keeping me out of things that are important to me? I mean, I agree it's not a term and condition, but you've gone after me, assume, because I've complained, and you're keeping me out of meetings. Wouldn't that be dissuading? And your answer is, we don't know why we kept her out of the meeting. We just did. I'm not sure exactly what the meeting was about. One meeting, so you have to know what the subject of the meeting is. I think it's about the Department of Public Health investigation. Well, let's just say it was about that for a moment. So you make a complaint. You are the person who is raising the complaint internally. Should you be part of that meeting, or is there an important reason? Is there an important business reason to exclude that person from the meeting? I don't know. If all your partners or colleagues met and you were just kept out of the meeting, they didn't tell you about the meeting, and the reason they did it is you complained, what would that effect be upon you? Wouldn't that dissuade you? It wouldn't. It wouldn't, Your Honor. I mean, if I raised a complaint, I would expect people to discuss my complaint. I wouldn't expect to be there as that complaint was being discussed. I would expect to be interviewed. I would expect to be asked questions. I would expect to be given input. All those things, which are on the record. She was asked to be able to provide. She was given the opportunity to provide her side of the story. She was invited to meetings to discuss it. Her concerns were taken seriously, and things were done about it. And, again, you have to look at the context of the record. You talk about a meeting, they hire an outside company. Let me ask Judge Montego, any questions? No, thank you. Okay. Thank you. Okay, two minutes for rebuttal. Thank you, Your Honor. Please reintroduce yourself. Sorry. Edward Foy again for Susan O'Hara. Just briefly on Muldrow, the rationale of that case was that there is no statutory language to the effect of substantial anywhere in Title VII. If there is no statutory language to that effect anywhere in Title VII, I think it would be the height of a rationality to limit that case to transfers. There is no statutory language to the effect of substantial in any context, transfers or whatever else. So I do not think that that is a sensible basis for distinguishing it. And, again, the circuits that have considered Muldrow since have applied it outside the context of transfers. My colleague's Rule 21 letter yesterday acknowledges that. RIO held that a mere admonition by a super RIO's case, Judge Hamilton held for the court, a mere admonition by a supervisor without any formal consequences does not represent a disadvantageous change in the terms and conditions. But that's a mere admonition. That was not anything like what we are talking about here. That's an underlying discrimination case. We also have, I think. Do you want to quickly address your opponent says temporal proximity is not enough and we don't have it here if you look at the whole record. Is he wrong on that? He is wrong on that, Your Honor. I think that the exclusion from the December meeting came literally within a week or two. I think in addition to that, I mean, just the fact. His response to that also was, well, it was about her complaint. So it would be kind of odd to have the complainant sitting in a room as we're talking about what's happening. And so it wasn't retaliatory. It was logical that that person wouldn't be there for that particular meeting. Precisely so, Your Honor. And if you look, I think, at the letter that she wrote on September 11, 2019, the person they put in charge of it, Dr. Buvendam, was himself quoted as saying to somebody, we have to protect Dr. Higgins. They put the person who said we have to protect him in charge of the investigation and then turn around and say, but that wasn't intended to prejudice the results in any way, shape, or form. One last item, if I may, a quote from the Burlington Northern B. White case. Excluding an employee from a weekly training lunch. A weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. Surely we have that here. Okay. Thank you. Okay. You're all excused. Let's then call the final case. Thank you, Counsel.